UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BUILDER SERVICES GROUP, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> MICHAEL HARKINS et al., ) <br> ) <br> Defendant. ) | Case No. 23-cv-11375 |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                      **July 21, 2023**

**I.    Introduction**

Plaintiff Builder Services Group, Inc. ("BSG") seeks injunctive relief against Defendants Michael Harkins ("Harkins"), Advanced Green Insulation, Inc. ("AGI") and Israel Aparecido Barroso ("Barroso") (collectively, "Defendants") enjoining them from allegedly violating contractual confidentiality and non-solicitation obligations, D. 4.  After considering the motion, Defendants' opposition and conducting oral argument on the motion, and for the reasons discussed below, the Court ALLOWS the motion, D. 4, and enters an Order of Preliminary Injunction.

**II.    Factual Background**

    **A.    BSG and AGI Employment**

BSG distributes building insulation and building product materials for the residential and commercial end-markets through its affiliates throughout the United States, including New

1

England. D. 1 ¶ 12. Harkins began working for BSG on April 5, 2021.[1] Id. ¶ 15. According to BSG, in September 2021, he transitioned to an expanded role in sales and production based out of Middleboro, Massachusetts. Id.; see D. 29-1 (Offer letter to Harkins for this position, electronically signed by him on September 30, 2021). According to Harkins, he did not transition into this expanded role until March 2022. D. 30-1 ¶ 8. On or about April 4, 2023, Harkins changed roles again and began working as a sales consultant. D. 1 ¶ 17. As a sales consultant, Harkins had access to highly confidential information and trade secrets. Id. ¶ 21. Allegedly telling BSG that "he was going to work for a cable company," Harkins resigned from BSG on May 8, 2023 and ceased working for BSG on May 22, 2023 and immediately commenced working for AGI. Id. ¶ 20. AGI, which BSG identifies as a direct competitor, also provides building insulation installation services in New England. Id. ¶¶ 13-14.

**B.      The BSG Agreement**

While BSG alleges that Harkins signed an earlier contract when his employment by BSG began in April 2021, it relies upon the Confidentiality, Intellectual Property Assignment, Non-Compete and Non-Solicitation Agreement (the "BSG Agreement"), D. 1-4, dated September 30, 2021, for the injunctive relief it seeks here. Accordingly, the Court turns to the relevant portions of the BSG Agreement.

---

[1] BSG alleges that Harkins "signed a Confidentiality, Intellectual Property Assignment, Non-Compete and Non-Solicitation Agreement" (the "April 8th Agreement") three days after he began working for BSG. D. 1 ¶ 15. The copy of the April 8th Agreement in the record is only signed by Harkins and not countersigned by BSG. See D. 1-3. Harkins acknowledges signing the April 8th Agreement, but claims that he contacted his supervisor and "rescind[ed] the agreement the next day" without his supervisor countersigning it. D. 24-1 ¶ 7. Given that BSG relies on the September 30, 2021 BSG Agreement, D. 1-4, which is electronically signed by both Harkins and his supervisor, the Court need not address whether the April 8th Agreement was rescinded for the purposes of resolving the pending motion for injunctive relief.

The BSG Agreement, which Harkins denies entering into, D. 24-1 ¶¶ 9–11, includes both a non-disclosure clause (Section II) and a non-solicitation clause (Section VII). D. 1-4 at 1, 3–4. The non-disclosure clause provides that the employee agrees, during his employment or at any time thereafter, not to "disclose any Confidential Information[2] to others or use the Confidential Information for Employee's own benefit or for the benefit of others. . . . Upon the termination of Employee's employment, Employee agrees to promptly return all Confidential Materials and other records, files, documents and other materials relating to the TopBuild Group's business, whether in hard copy or electronic format." D. 1 ¶ 30; see D. 1-4 at 1. The non-solicitation clause provides that the employee agrees, for a period of one year after the termination of his employment with BSG not to "[c]ontact or otherwise solicit any employee, consultant, or independent contractor of [BSG] with the intention of encouraging such person to terminate his or her employment or other relationship with [BSG] or any of its Affiliates, or employ or otherwise hire or engage any such person; [s]olicit, call upon, accept work and/or orders for product from, or initiate communication or contact with any Customer for the purpose of offering Competitive Products to such Customer, or otherwise offer Competitive Products to such Customer; [s]olicit, call upon or initiate communication or contact with any Customer, vendor or supplier of [BSG] or any of its Affiliates for the purpose of encouraging such person to terminate, place elsewhere or reduce the volume of

---

[2] The BSG Agreement defines "Confidential Information" as:

[s]uch trade secrets and information include, without limitation, confidential information, whether in tangible or intangible form, regarding [BSG's] products, services, marketing strategies, business plans, operations, costs, current or prospective customer information, . . . product concepts, designs, specifications, research and development efforts, technical data and know-how, sales information (including pricing and other terms and conditions of sale), financial information, internal procedures, techniques, forecasts, methods, trade information, software programs, project requirements, inventions and all other information which is not generally known to those outside [BSG].

D. 1-4 at 1. Accordingly, when the Court references Confidential Information in this Memorandum and Order (and the accompanying Order of Preliminary Injunction), it is referring to this definition which includes, but is not limited to, trade secrets.

3

its business with [BSG] or its Affiliates; or [o]therwise attempt to directly or indirectly interfere with [BSG's] or any of its Affiliates business or its relationships with its employees, independent contractors, vendors, suppliers or Customers."  D. 1 ¶ 31; see D. 1-4 at 3–4.

### C. Alleged Misappropriation of BSG Confidential Information and Unlawful Solicitation of BSG's Customers

Between May 5, 2023 (three days before his resignation from BSG) and May 22, 2023 (the date of his last day at BSG), Harkins sent several offers for BSG to bid on projects in Massachusetts, a spreadsheet listing the labor rates that BSG pays its installers on piecework and several spreadsheets compiling all the permits pulled in Massachusetts ("Henry Reports") which BSG purchased to generate sales leads, from his BSG email to his personal email.  D. 1 ¶ 33. Harkins, on behalf of AGI and Barroso, has also allegedly solicited, called upon and accepted work and/or orders from BSG's customers, including diverting an order that Harkins had booked for BSG before his termination to AGI on June 15, 2023.  Id. ¶ 35; see D. 28-3 (unredacted photo of AGI vehicle and forms for this work and order).

### III.    Standard of Review

Injunctive relief "is an 'extraordinary and drastic remedy.'"  Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Munaf v. Geren, 553 U.S. 674, 689–90 (2008)).  To obtain such relief, the Court must consider:  (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities between the parties; and (4) whether granting the injunction is in the public interest.  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).  A plaintiff "bears the

burden of establishing that these four factors weigh in its favor." Esso Standard Oil Co. (P.R.) v. Monroig-Zayas, 445 F.3d 13, 18 (1st Cir. 2006) (citation omitted).

## IV. Procedural History

On June 20, 2023, BSG filed its complaint asserting claims for breach of contract, misappropriation of trade secrets, breach of fiduciary duty, tortious interference and unfair and deceptive trade practices, D. 1 at 11–20, and moved for a temporary restraining order against Defendants, D. 4. On June 27, 2023, the Court entered a temporary restraining order, in effect until the Court's hearing on the motion, enjoining Defendants from misappropriating BSG's confidential information and trade secrets, violating any of Harkins' obligations under the BSG Agreement or taking any action to spoliate any devices capable of performing computing devices that Defendants used or had access to that may contain BSG's confidential information or trade secrets. D. 18. On July 11, 2023, the Court heard the parties on the pending motion for injunctive relief, took the matter under advisement and extended the existing temporary restraining order until July 21, 2023 pending the Court's ruling on the motion. D. 25, 27.

## V. Discussion

### A. Injunctive Relief Factors

#### 1. *Likelihood of Success on the Merits*

Although BSG also asserts other claims, the focus of its motion for injunctive relief is on its claims for breach of contract and misappropriation of trade secrets. D. 5 at 9-16. Accordingly, the Court's analysis of its reasonable likelihood of success on the merits will focus on these claims.

##### a) Breach of Contract (Count I)

To prevail in a breach of contract action under Florida law, which governs the BSG Agreement, D. 1-4 at 5, "a plaintiff must prove: (1) a valid contract existed; (2) a material breach

5

of the contract; and (3) damages." Deauville Hotel Mgmt., LLC v. Ward, 219 So. 3d 949, 953 (Fla. Dist. Ct. App. 2017) (citation omitted).[3]

As a preliminary matter, Harkins claims that he never signed the BSG Agreement. D. 24-1 ¶ 11; D. 30-1 ¶ 5. Harkins also claims that he did not have access to his desktop computer at the time that BSG alleges he signed the BSG Agreement because he was on vacation. D. 30-1 ¶¶ 6-7. These claims are contradicted, however, by the appearance of Harkins' electronic signature on the face of the BSG Agreement. D. 1-4 at 6. Under Florida law, "electronic signatures are valid." Mattson v. WTS Int'l, Inc., No. 20-cv-1245-CEH-AEP, 2021 WL 1060211, at *7 (M.D. Fla. Mar. 20, 2021) (citing Haire v. Fla. Dep't of Agric. & Consumer Servs., 870 So. 2d 774, 789 (Fla. 2004) and Fla. Stat. § 668.004). Following a hearing on the pending motion for injunctive relief, BSG submitted additional evidence corroborating the authenticity of Harkins' electronic signature, including another copy of the BSG Agreement that includes an additional page showing that Harkins signed the document via DocuSign, an electronic document signing and verification software program. D. 28-2 at 7. BSG also submitted a DocuSign "Certificate of Completion" which verifies the date and time of Harkins' signature as September 30, 2021 at 9:26 a.m., along with the email and IP addresses he used to access the document. D. 29-3 at 1. Furthermore, a unique code below Harkins' signature on the BSG Agreement, "DA24B4C5982340C," matches the code that appears below his signature on the DocuSign "Certificate of Completion." Compare D. 28-2 at 6 with D. 29-3 at 1; D. 29 ¶¶ 9-14.

Additionally, Harkins' electronic signature, also dated September 30, 2021, appears on an offer letter addressed to him for a "Hybrid - Production/Sales position" (the "Offer Letter"). D.

---

[3] Although BSG cited to Massachusetts law in its brief, the BSG Agreement contains a choice-of-law provision providing that "[t]he internal procedural and substantive laws of Florida shall govern this Agreement." D. 1-4 at 5.

29-1 at 1. A separate DocuSign "Certificate of Competition" indicates that Harkins' signature was entered at 9:25 a.m. using the same email address and IP address that was used to access and sign the BSG Agreement under his name. Compare D. 29-4 at 1 with D. 29-3 at 1. And as with the BSG Agreement, the unique code below Harkins' signature on the Offer Letter, "00F16D4FFFEF456," matches the code on this DocuSign "Certificate of Competition." Compare D. 29-4 at 1 with 29-1 at 1; D. 29 ¶¶ 15-19. Lastly, BSG submitted the affidavit of James Roe, its director of Human Resources Operations, which describes BSG's recordkeeping process and attests that Harkins electronically signed the BSG Agreement and the Offer Letter at virtually the same time on the same day using the same IP address. See D. 29 ¶¶ 11, 17. Thus, despite Harkins' contentions to the contrary, BSG has provided substantial evidence to show that Harkins signed the BSG Agreement on September 30, 2021 at around the same time that he accepted the Hybrid – Production/Sales position with BSG.[4] Accordingly, BSG is reasonably likely to succeed in showing that Harkins electronically signed the BSG Agreement and is bound by its terms.

Turning to the terms of the BSG Agreement, its non-disclosure and non-solicitation clauses are valid and enforceable. Under Florida law, such clauses are enforceable if they are "reasonably necessary to protect [a] legitimate business interest." Walsh v. Paw Trucking, Inc., 942 So. 2d 446, 448 (Fla. Dist. Ct. App. 2006) (alteration in original) (quoting § 542.335(1)(c), Fla. Stat. (2003)). The term "legitimate business interest" includes "[t]rade secrets, as defined in §

---

[4] Harkins argues that even if he signed the Offer Letter, it is not supported by consideration because "the Offer [Letter] delineates no change in tasks, responsibilities or compensation, and is merely a continuance of [his] prior duties, with no changes whatsoever." D. 30 at 2. The Court has considered the Offer Letter only to the extent that it supports BSG's assertion that Harkins signed the BSG Agreement at the same time that he purportedly accepted the new position. Even assuming *arguendo* that the Offer Letter is not enforceable for lack of consideration, the Court concludes, based on the other evidence BSG has submitted and for the reasons discussed above, that BSG is reasonably likely to establish that Harkins signed the BSG Agreement.

688.002(4)," "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets," and "[s]ubstantial relationships with specific prospective or existing customers, patients, or clients." § 542.335(1)(c), Fla. Stat. (2003). "[A] 'legitimate business interest' is an identifiable business asset that constitutes or represents an investment by the proponent of the restriction such that, if that asset were misappropriated by a competitor (i.e., taken without compensation), its use in competition against its former owner would be 'unfair competition'"; i.e., "a 'legitimate business interest' is a business asset that, if misappropriated, would give its new owner an unfair competitive advantage over its former owner." White v. Mederi Caretenders Visiting Servs. of Se. Fla., LLC, 226 So. 3d 774, 784–785 (Fla. 2017) (emphasis omitted) (citation omitted).

(1)     Alleged Breach of Non-Disclosure Clause

Here, BSG is reasonably likely to succeed in showing that Harkins breached the non-disclosure clause. To show a breach of this clause, BSG must show that Harkins disclosed "Confidential Information to others or use[d] the Confidential Information for [his] own benefit or for the benefit of others." D. 1 ¶ 30; see D. 1-4 at 1. BSG has alleged that Harkins had access to several categories of Confidential Information while performing his job duties as a sales consultant, including customer lists and related information, vendor lists, BSG's proprietary customer relationship management database, BSG-specific pricing models, competitive intelligence regarding BSG's competitors, account strategies regarding BSG's past or current customers and customer prospects and internal assessments regarding the strengths and weaknesses of ongoing projects. D. 1 ¶ 21. BSG has identified seven instances in which Harkins allegedly sent himself several offers for BSG to bid on projects in Massachusetts; a spreadsheet listing the labor rates that BSG pays its installers on piecework; and several Henry Reports which

BSG purchased to generate sales leads. Id. ¶ 33. Neither of Harkins' affidavits dispute that he sent these items to his personal email address, see D. 24-1; D. 30-1.

Given the definition of Confidential Information under the BSG Agreement, moreover, at a minimum, BSG's internal information concerning its labor rates for installers from an internal spreadsheet that Harkins sent to his personal email on the eve of his departure from BSG, D. 1 ¶ 33(d), falls within this definition. Accordingly, BSG has shown a reasonable likelihood of success as to its breach of contract claim against Harkins as to the non-disclosure clause of the BSG Agreement.

(2)   Alleged Breach of Non-Solicitation Clause

BSG is also reasonably likely to succeed in showing that Harkins breached the non-solicitation clause of the BSG Agreement. D. 1 ¶ 31; see D. 1-4 at 3–4. Under Florida law, "[t]he right to prohibit the direct solicitation of existing customers is a legitimate business interest, and a covenant not to compete which includes a non-solicitation clause is breached when a former employee directly solicits customers of his former employer." Alonso-Llamazares v. Int'l Dermatology Rsch., Inc., 339 So. 3d 385, 396 (Fla. Dist. Ct. App. 2022) (citation and internal quotation marks omitted).

Here, BSG has alleged that Harkins, on behalf of AGI and Barroso, solicited, called upon and accepted work or orders from BSG's customers. D. 1 ¶ 35. According to BSG, on June 15, 2023, Harkins booked an order for AGI that he had booked for BSG before his termination and that BSG should have performed. Id. BSG has provided photos of an AGI truck and an AGI service order, dated June 13, 2023, showing Harkins to be the salesman for the project that BSG allegedly should have performed. D. 28-3. While Harkins attests that several of BSG's customers "expressed interest in continuing to do business with [him] wherever [he] landed," D. 24-1 ¶ 19,

9

he does not dispute that he booked the BSG customer identified in the AGI work order while he worked for BSG, see id.; see generally D. 30-1. Given that Harkins only ceased working for BSG less than one month before the date of this AGI service order bearing his name, BSG is reasonably likely to succeed in showing that Harkins breached the non-solicitation clause of the BSG Agreement.

                b)       <u>Misappropriation of Trade Secrets (Counts II and III)</u>

BSG also asserts that Defendants misappropriated its trade secrets in violation of both the Massachusetts Uniform Trade Secrets Act (the "MUTSA"), Mass. Gen. L. c. 93, § 42, and the Defend Trade Secrets Act (the "DTSA"), 18 U.S.C. § 1836. "To prevail on a claim of misappropriation of trade secrets under Massachusetts law, a [plaintiff] must establish that 1) the information at issue constitutes a trade secret, 2) the [plaintiff] took reasonable measures to secure the confidentiality of the information and 3) the [defendant] obtained the trade secret through improper means." Sensitech, Inc. v. LimeStone FZE, 581 F. Supp. 3d 342, 349 (D. Mass. 2022). A plaintiff may also bring a claim under the federal DTSA for misappropriation of a trade secret "if it is related to a product or service used in or intended to be used in interstate or foreign commerce." Id. (citing 18 U.S.C. § 1836(b)(1)). "The standard for misappropriation under the DTSA is substantially similar to that under Massachusetts law." Id.

                (1)       The Trade Secrets at Issue

As discussed above, BSG has identified three categories of Confidential Information that Harkins allegedly sent to his personal email and which conferred upon AGI a competitive advantage: (1) BSG's internal information concerning its pay rates for installers; (2) Henry Reports containing information about permits pulled in Massachusetts; (3) and customers' invitations to BSG to bid on specific projects. D. 1 ¶ 33. Neither of Harkins' affidavits dispute that he sent

10

these materials to his personal email.  See D. 24-1; D. 30-1.  Harkins claims, rather, that "[a]ll of the information [he] transferred is information that is publicly available."  D. 24-1 ¶ 20.

"A trade secret may consist of 'any formula, pattern, device or compilation of information which is used in one's business, and which [provides] an opportunity to obtain an advantage over competitors who do not know or use it.'"  TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 27 (D. Mass. 2004) (quoting Burten v. Milton Bradley Co., 763 F.2d 461, 463 (1st Cir. 1985)).  "A trade secret need not have the novelty that is requisite for a patent, it must only confer a competitive advantage on its possessor."  Id. at 29.  Nevertheless, "[t]he subject matter of a trade secret must be secret" and "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret."  J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 736 (1970)) (citation and internal quotation marks omitted).  Courts are to consider six factors to determine whether any given set of business information is secret: "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972).

To the extent that the bid invitations were "marketing emails containing public offers to bid" as Harkins claims, D. 24-1 ¶ 20, it is not clear that such information constitutes a trade secret.  It is also not clear that the Henry Reports, to the extent that Massachusetts permit information is public knowledge, constitute trade secrets.  Nevertheless, at minimum, the Jet Spray Cooler factors

weigh in BSG's favor with respect to its internal spreadsheet regarding its labor rates. D. 1 ¶ 30(d). BSG does not allege that those rates are known outside of BSG and it is uncontroverted that BSG limited the disclosure and distribution of its confidential information to "only a small number of employees and exclusively on a need-to-know basis through the use of an internal program which limits access to information based on user access credentials, multi-factor authentication (MFA), and permission." D. 1 ¶ 26. It is uncontroverted that BSG, among other measures, trained all users of BSG's computers and networks through online training and conducting regular phishing exercises, monitored user behavior and promulgated confidentiality and information security policies. Id. Furthermore, BSG required all employees with access to its Confidential Information to enter into agreements restricting the disclosure and use of same and requiring employees to return same upon termination of their employment. Id. ¶¶ 27, 30. BSG's internal information concerning its labor rates for installers is likely valuable because it could not only allow competitors like AGI to prepare bids at a more competitive rate than BSG, but also allow competitors to poach installers from BSG by offering them higher labor rates. For these reasons, BSG is, at minimum, reasonably likely to establish that its internal compilation of its labor rates are a trade secret. See Protege Software Servs., Inc. v. Colameta, No. CIV. A. 09-03168, 2012 WL 3030268, at *12 (Mass. Super. July 16, 2012) (concluding that plaintiff's "pricing information" may constitute a trade secret); Bruno Int'l Ltd. v. Vicor Corp., No. 14-cv-10037-DPW, 2015 WL 5447652, at *12 (D. Mass. Sept. 16, 2015) (concluding that "pricing information" can constitute a trade secret "where the information provides its holder with a competitive advantage").

      (2)      Whether BSG Took Reasonable Steps to Preserve Secrecy

BSG "must also show that it has taken reasonable measures to protect secrecy." TouchPoint, 345 F. Supp. 2d at 29 (citation omitted). "Courts consider several factors in examining that prong, including: 1) the existence or absence of a [Confidential Disclosure Agreement], 2) the nature and extent of precautions taken, 3) the circumstances under which the information was disclosed and 4) the degree to which the information has been placed in the public domain or rendered readily ascertainable." Id. (citation omitted).

Here, all four factors weigh in BSG's favor with respect to the efforts it took to preserve the secrecy of its pay rates. Harkins signed the BSG Agreement, which contains a non-disclosure clause. D. 1-4 at 1. As discussed above, it is uncontroverted that BSG took a number of safety precautions to preserve the secrecy of this information and even required all employees with access to its confidential information and trade secrets to enter into confidentiality agreements requiring the return of proprietary information. D. 1 ¶¶ 26–27, 30; see CPI Card Grp.--Colorado, Inc. v. Lehouck, No. 14-cv-13435, 2014 WL 5025356, at *6 (D. Mass. Oct. 8, 2014) (crediting employer's precautionary measures which included maintaining extensive external and internal security systems, requiring employees to sign confidentiality agreements and requiring employees to relinquish all of employer's property upon termination of their employment). It is also uncontroverted on this record that BSG's pay rates were disclosed only because Harkins emailed these documents from his work email to his personal email without BSG's authorization, D. 1 ¶ 33, and there is no suggestion that this information is otherwise in the public domain. Accordingly, BSG is reasonably likely to establish, at minimum, that it took reasonable measures to protect the secrecy of its pay rates.

        (3)      Whether Defendants Used Improper Means to Obtain and Disclose Trade Secrets

As a matter of law, an individual who breaches contractual duties to obtain trade secrets has used improper means. AnywhereCommerce, Inc. v. Ingenico Inc., No. 19-cv-11457-IT, 2023 WL 2694043, at *13 (D. Mass. Mar. 29, 2023) (citation omitted). A party who knowingly benefits from the breacher's trade secret bounty is also liable. AnywhereCommerce, Inc., 2023 WL 2694043, at *13; Curtiss–Wright Corp. v. Edel–Brown Tool & Die Co., 381 Mass. 1, 5–6 (1980). In light of the Court's ruling on BSG's breach of contract claim, the Court concludes that BSG is reasonably likely to succeed in establishing that Defendants used improper means to obtain and disclose BSG's trade secrets.

For all these reasons, BSG is reasonably likely to establish that Defendants misappropriated its trade secrets in violation of the MUTSA and DTSA.

      2.    *Risk of Irreparable Harm*

To obtain injunctive relief, a plaintiff must also show a "significant risk of irreparable harm if the injunction is withheld." EEOC v. Astra USA, 94 F.3d 738, 742 (1st Cir. 1996) (citation omitted). "When a plaintiff demonstrates likelihood of success on a misappropriation of trade secrets claim, it need not prove irreparable injury because such harm is presumed." EchoMail, Inc. v. Am. Express Co., 378 F. Supp. 2d 1, 4 (D. Mass. 2005); see TouchPoint, 345 F. Supp. 2d at 32 (same); Picker, 931 F. Supp. at 44 (same). The risk of irreparable harm to BSG is particularly compelling here where there is evidence that Harkins, on behalf of AGI, has already accepted work from a BSG customer less than one month after leaving BSG. See D. 28-3. Accordingly, the risk of irreparable harm to BSG is sufficient to warrant an injunction at this time.

3.      *Public Interest*

Injunctive relief is not appropriate unless there is "a fit (or lack of friction) between the injunction and the public interest." Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (citation omitted). "In cases involving restrictive covenants between private parties performing private work, analysis of the 'public interest' prong is usually confined to brief platitudes." Oxford Glob. Res., Inc. v. Guerriero, No. Civ. A. 03-12078-DPW, 2003 WL 23112398, at *10 (D. Mass. Dec. 30, 2003). Given the general public "interest in the enforcement of valid contracts," Lombard Med. Techs., Inc. v. Johannessen, 729 F. Supp. 2d 432, 443 (D. Mass. 2010) (concluding that the enforcement of non-competition agreements that were "relatively mild" and "designed to protect [employer's] confidential information and good will" served the public interest), the Court concludes that the issuance of injunctive relief here would be consistent with the public interest. Massachusetts also has a clear public policy in favor of strong protections for trade secrets. See Jet Spray Cooler, 377 Mass. at 166 & n. 8. Accordingly, the Court sees no friction between the public interest and the issuance of injunctive relief in this case.

4.      *Balance of Equities*

"Any potential harm caused to [BSG] by a denial of its motion must be balanced against any reciprocal harm caused to [Defendants] by the imposition of an injunction." TouchPoint Sols., 345 F. Supp. 2d at 32. An injunction prohibiting Defendants from misappropriating BSG's Confidential Information (and assuring that such is not in the possession of Defendants[5]) and from soliciting BSG's existing customers on AGI's behalf does little to affect the existing legal

---

[5] The Court notes that Defendants have indicated that Harkins "has agreed to return all information he originally transferred to his private email account and is willing to allow examination of his electronic devices to affirm that the removal [of same] from such devices has already occurred." D. 30 at 3; see D. 24-1 ¶ 23.

relationship between the parties as Harkin, now an employee of the other Defendants, is already legally barred from committing these acts.  , the balance of equities weighs in favor of granting the proposed injunctive relief.

Accordingly, the Court shall issue an order that enjoins Defendants from acquiring or divulging BSG's Confidential Information, continuing to violate Harkins' obligations under the BSG Agreement, including enjoining him from soliciting its customers, and divulging, distributing or otherwise using BSG's Confidential Information and taking any action to spoliate any and all devices that may contain BSG's Confidential Information.  That order shall further grant BSG access to Harkins' personal accounts and devices for the purpose of determining whether he retained, accessed, used or disclosed its Confidential Information or took any actions in violation of the BSG Agreement, and require Defendants to return immediately any such Confidential Information in its possession.

## VI.   Conclusion

For the above reasons, the Court ALLOWS BSG's motion, D. 4, and will issue a separate Order of Preliminary Injunction consistent with this opinion.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge